**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| ROBERT COWAN | : | |
| | : | Civil Action No. 06-5459 (PGS) |
| Plaintiff, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| BOARD OF EDUCATION OF THE | : | |
| BOROUGH OF CARTERET, et al. | : | |
| | : | |
| Defendants. | : | |

**SHERIDAN, U.S.D.J.**

This case comes before the Court on Defendants' motions for summary judgment. Plaintiff, Robert Cowan ("Cowan'), a history teacher at Carteret High School, filed this action pursuant to 42 U.S.C. § 1983 against the Board of Education of the Borough of Carteret (the "Board"), Kevin Ahearn, Superintendent ("Ahearn"), and Lamont Repollet, Principal of Carteret High School ("Repollet")[1] for alleged violations of the First Amendment, Fourteenth Amendment, and the New Jersey Constitution.

Defendants raise several issues with regard to Plaintiffs' three claims. First, Cowan's class schedule was changed and according to Cowan it restricted his ability to serve as president of the Carteret Education Association (CEA) and in violation of his right to associate with union members. The defendants argue that the change does not constitute an adverse employment decision and is

---

[1] The suit also named each Board of Education member individually; on November 23, 2009, the Court dismissed those parties for lack of any culpable action.

therefore barred. The second claim concerns a one-week suspension with pay, which Cowan claims was in retaliation for filing this instant lawsuit, a right protected under the First Amendment. The Defendants claim it relates to Cowan leaving his class unsupervised for twenty minutes. Finally, there is another suspension with pay for disruption of school activities. Evidently, Cowan distributed Jack London's essay "The Scab" to three teachers at the high school that crossed a teacher's union picket line which upset the non-picketing teachers. Cowan, on the other hand, claims the suspension was in violation of his right to free speech and association to represent the union. Defendants argue, among other things, that the doctrine of qualified immunity applies in each instance to bar Plaintiff's claims.

Defendants filed their first motion for summary judgment on August 17, 2009, and filed a second summary judgment motion based exclusively on the doctrine of qualified immunity on December 17, 2009. While Plaintiff asserts that the Court should find Defendants waived their qualified immunity defense by not raising it in their first summary judgment motion, federal courts are generally reluctant to waive qualified immunity defenses. *See* Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 9A.14[C][b] (4th ed. 2005). At one point, Plaintiff argues that the motion to grant qualified immunity has cost plaintiff time and expense due to its tardiness immediately before trial.[2]

---

[2] Generally, qualified immunity may hold a public employee not only immune from liability but also immune from suit. Fed. Judiciary Ctr., *Section 1983 Litigation* 143 (2d ed. 2008). Qualified immunity may be advanced at an early stage of the litigation to hold the public employee immune from suit. Here, Cowan decries Defendants' lateness of filing for same until after a summary judgment motion was briefed, and a final pretrial order entered.

Although the motion may be late, it is not egregious. The Complaint was filed in November 2006, and Plaintiff filed an amended complaint in August 2008, about twenty months later, setting forth new grounds for liability. In fact, the grounds within the complaint changed twice based on occurrences at school. Thereafter, an answer was filed in September 2008, and

## I.

Cowan taught American History at Carteret High School for the last thirty-seven years. He is a long serving member of the local teachers union, the CEA, and for approximately the last fourteen years he served as president. When elected to its presidency in approximately 1992, the administration provided Cowan a work schedule that required him to teach four consecutive periods of American History, followed by lunch, a preparation period and a union activity period.

On or about July 1, 2005, the CEA and the Board negotiated a three year collective bargaining agreement ("CBA").

On September 25, 2005, Dennis Siddons, who at that time was Principal/Assistant Superintendent emailed Superintendent Ahern concerning Ahern's obsession "with getting Cowan." Siddons had an "impression" that "the focus of the Board had changed from educating kids to going after the Association and Bobby [Cowan] in particular."

In December 2005, the Board conducted a public meeting where one agenda item included approval of construction work to third parties. Cowan objected because the construction work was routine maintenance work in his judgment, and was usually performed by union members.

---

about a year later (August 17, 2009), a motion for summary judgment was raised. In reviewing the first summary judgment motion, the Court queried whether the qualified immunity defense may be pertinent; and this led to additional briefing. In short, the additional qualified immunity briefing caused no substantial harm to either party. It is fair that plaintiff amended the facts in the Complaint twenty months after it was initially filed, and concomitantly that defendants were allowed additional briefing now. *See Eddy v. Virgin Island Water*, 256 F. 3d 204 (3d Cir. 2001). Moreover, in § 1983 actions, there are often two motions – one for qualified immunity and one for summary judgment. As such, despite the tardiness of this motion, it did not require any extra work by plaintiff's counsel. Hence, the Court will review any future fee requests (including these) as with others at the appropriate time, but no special weight shall be given to plaintiff's expenses here.

According to Siddons, who was present, the Board members and Cowan became enraged. Cowan called the Board "liars" and certain members (who were not identified) called Cowan a "fool."

On April 13, 2006, Cowan and another teacher had an altercation at the school. There were two video cameras in the vicinity. The video footage of one camera that recorded the altercation "was pulled on the date" of reporting of the incident to the administration. The second video camera was not utilized, and the video was not reviewed.

On or about July 1, 2006, defendant Repollet became Principal of Carteret High School (Siddons remained Assistant Superintendent). Immediately thereafter Cowan received a new schedule, where he was assigned to teach a course in World Culture and History requiring significant preparation time (for the first time in his career). In addition, the new schedule eliminated the consecutive three "non-duty" periods that allowed him to accomplish CEA work. Under the new schedule, Cowan felt aggrieved because he was required to teach new courses and to teach every other period.

Cowan admits that under the new schedule he had one free period per day to conduct CEA business, which was in accord with the CBA. However, Cowan alleges that his teaching schedule was changed to deliberately make it "near impossible" for him to perform his responsibilities as CEA president. According to Cowan, he solely taught American History courses over his approximately forty-year teaching career, and Defendants knew that by changing his schedule on the eve of the 2006 academic year and to include new courses, World Culture and World History, made his ability to tend to union matters difficult. Defendants counter that Plaintiff is certified to teach World History and World Cultures, and that devising the schedule is a managerial task undertaken by the principal. Pursuant to this discretion, schedule changes were required because defeat of the school budget

4

created a multimillion dollar budget deficit.

In that same time period, all non-tenured staff were notified that they would not be receiving contracts for the upcoming year and to cope with the budget deficit, and the Board transferred thirty-six (36) staff members to different schools during the summer of 2006.

On August 9, 2006, Cowan filed a grievance regarding the schedule change. Repollet, the new principal, responded to Cowan's grievance stating that the schedule was altered to create a master schedule to meet the needs of the school. As a result, the grievance was denied.

On November 7, 2006, Assistant Superintendent Kathleen Skobo ("Skobo") completed her review of the altercation between Cowan and another teacher. On this date, she notified Superintendent Ahern that "Mr. Cowan left his class unsupervised for approximately ten minutes" on April 13, 2006; and she dismissed the altercation charges due to a lack of interest in the matter by Cowan and the other teacher.

On November 15, 2006, Cowan filed this lawsuit alleging the change in his schedule and the requirement to teach World History rather than American History were adverse employment actions due to his union participation. A summons was issued within several days and within a month the Complaint was served.

Within several days of the receipt of the Complaint, Cowan alleges that the Defendants took other retaliatory actions against him. More specifically, Cowan alleges that on December 1, 2006, Ahearn trumped up a disciplinary charge against him because he abandoned his class without providing supervision, as Skobo reported.

On December 1, 2006, Ahearn sent Cowan a memorandum charging that Cowan had abandoned his classroom on the morning of April 13, 2006 for a period of sixteen minutes during

5

which time Cowan's students were unsupervised. As a result, Cowan was suspended with pay for one week. Cowan argues that this allegation of abandonment was unfounded and was a means to retaliate against him for filing his lawsuit a few weeks earlier.

On December 18, 2006, the Board heard the abandonment charge; but Cowan presented no evidence. Cowan did not testify and he did not call any witnesses. The Board affirmed the decision on grounds that there was evidence he left his classroom unsupervised for twenty minutes, which violated school policy. The minutes of the meeting state:

> NOW, THEREFORE, BE IT RESOLVED, by the Carteret Board of Education as follows:
>
> (1) On April 13, 2006, Mr. Cowan left his class prior to and during first period class for more than 20 minutes, during which time the students in his class were not supervised.
>
> (2) Mr. Cowan's conduct in failing to provide supervision for the students in his charge placed the students in danger and constitutes conduct unbecoming a teaching staff member.
>
> (3) Mr. Cowan is hereby suspended with pay on the following days: December 19, 2006; December 20, 2006; December 21, 2006; and January 2, 2007.

During the course of this litigation, Cowan now advances that he left his classroom pursuant to an order from then-principal and assistant superintendent Siddons. Presently, Cowan states that Siddons always sent an adult to supervise his classroom when necessary, and Siddons sent a teacher to cover Cowan's absence on April 13, 2006. Siddons agreed with Cowan. He said "No. No. I had told Bob Cowan that I would cover his classroom." Further, Siddons testified at his deposition that no one from the administration contacted him regarding this abandonment accusation, and if asked, he would have corroborated Cowan's story. Neither Siddons nor Cowan identify the substitute

provided. As noted above, Cowan's and Siddon's testimony were not known by the Defendants at the time of the disciplinary charge.[3]

In Spring 2008, Cowans, on behalf of the CEA, organized a "legal job action" against the Board because the Board intentionally delayed negotiations on the CBA, which was expiring on June 30, 2008.  As a result, the membership of the CEA picketed schools before their scheduled start times, and would immediately leave work at their scheduled time.  Three members of the CEA refused to participate in the job action and crossed the picket line by reporting to work early.  In response, Cowen placed Jack London's one-page essay "The Scab" in these individuals' school mailboxes.  The essay reads:

### The Scab

After God had finished the rattlesnake, the toad, and the vampire, He

---

[3] In addition to the above allegations by Cowan, he also raises a spoilation issue. Evidently, there were two video cameras in the vicinity of Cowan's classroom. The second camera was not impounded, and the tape automatically erased itself.  Cowan alleges that this was spoilation, and that a negative inference be charged against Defendants due to the loss of the tape.  A spoilation claim is decided on a case by case approach, where the court must consider the "degree of fault on the part of the party accused of spoilation and the degree of prejudice to the opponent." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 81 (3d Cir. 1994).  Cowan has not proffered any evidence that this tape was intentionally destroyed during the pendency of this litigation.  The evidentiary rationale behind a spoilation inference is "that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [evidence] is more likely to have been threatened by [that evidence] than is a party in the same position who does not destroy the document." *Nation-wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1st Cir. 1982).
  There is no evidence on the record that Defendants destroyed the video tape.  The security tape automatically erases every few days.  Defendants contend that the video tape that led to Cowan's suspension was preserved in the altercation investigation, and the alleged abandonment of his class was not uncovered until six months later.  At the time of the automatic erasure, there was no notice to the Defendants that the second video camera was potentially relevant in a future proceeding.  The Court finds no fault on the part of the Defendants due to the automatic erasure of the security tape.

> had some awful substance left with which he made a SCAB. A SCAB is a two-legged animal with a corkscrew soul, a water-logged brain, and a combination backbone made of jelly and glue. Where others have heart, he carries a tumor of rotten principles.
>
> When a SCAB comes down the street, men turn their backs and angels weep in Heaven, and the devil shuts the gates of hell to keep him out. No man has the right to be a SCAB, so long as there is a pool of water deep enough to drown his body in, or a rope long enough to hang his carcass with. Judas Iscariot was a gentleman compared with a SCAB. For betraying his master, he had character to hang himself ... A SCAB hasn't.
>
> Esau sold his birthright for a mess of pottage. Judas Iscariot sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. The modern SCAB sells his birthright, his country, his wife, his children and his fellow men for an unfulfilled promise from his employer, trust, or corporation.
>
> Esau was a traitor to himself; Judas Iscariot was a traitor to his God, Benedict Arnold was a traitor to his country. A SCAB is a traitor to himself, a traitor to his God, a traitor to his country, a traitor to his family and a traitor to his class.
>
> There is nothing lower than a SCAB.

Cowan placed the essay in each mailbox so that it could not be read by anyone else. The essay angered two of the teachers who in turn reported the incident to Superintendent Ahearn. As a result, Repollet and Ahearn immediately interviewed Cowan, and Cowan denied placing any "letters" in the mailboxes. Despite Cowan's denial, a review of the security camera footage showed Cowan placing the essay in the mailboxes. Cowan was charged with breaching Board Policy 3233 "Political Activity" which provides that: "A teaching staff member shall not engage in any activity in the presence of pupils while on school property, which activity is intended and/or designed to promote, further or assert a position on labor relations issues." As a result, on June 11, 2008, Cowan

was suspended for one week with pay.  (Def. Mot. Ex. W.)  Superintendent Ahearn advised Cowan about the suspension.  Ahearn's letter states:

> This letter will confirm that I met with you earlier today in Lamont Repollet's office to discuss an incident that occurred yesterday, June 10, 2008. Also in attendance at the meeting were Lamont Repollet, Mike Kushner, and Jacqueline Lygate, as your representative.
>
> You are hereby suspended with pay from your employment as teacher for the Carteret Public Schools, effective immediately, pending action by the Carteret Board of Education ("Board"). Your suspension is a consequence of your inappropriate and unprofessional workplace conduct on June 10, 2008.  You must hand in your grade book and a copy of your final exam(s) to Lamont Repollet today. During the period of your suspension, you may not enter any Carteret school building.
>
> Your recent conduct raises significant concerns, especially in view of your pattern of inappropriate and unprofessional conduct in the past.  The Board will be asked to approve your suspension at the Board's public meeting on June 18, 2008 commencing at 7:00 p.m. at the Administrative Building, 599 Roosevelt Avenue, Carteret, New Jersey 07008. During the course of the meeting, the Board will retire into closed session to discuss this matter which may affect your employment status with the Board and which may result in the Board's taking further disciplinary action in connection with this matter, including, but not limited to, the withholding of your salary and adjustment increments in the 2008-09 school years.

## II.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact, and that the evidence establishes the movant's entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A genuine issue of fact exists only if a reasonable jury could return a verdict for the non-movant, and it is material only if it may affect the outcome of the suit based upon substantive law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

After the movant has satisfied this burden, the non-moving party must establish that a genuine issue of material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).  Rather, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 247-48.

### III.

The Supreme Court has emphasized that qualified immunity issues should be resolved as soon a possible. *Anderson v. Creighton*, 483 U.S. 635, 646 (1987).  Therefore, the Court will first examine Defendants' qualified immunity arguments.

**A.     Count I:  Plaintiff's Schedule Change**

In the first count, the retaliatory action was that Cowan's schedule was changed; and World History and World Culture courses were assigned to Cowan for the first time in his forty (40) year career. Cowan alleges he was the only teacher given new courses to teach. Defendants counter that the budget deficiency affected many teachers including Cowan, and these actions by the administration were designed to improve efficiency.  As a preliminary matter, this Count alleges that

10

it was Repollet, the principal, who changed his schedule while other Defendants were not involved.[4]

Cowan alleges that his schedule was changed because he was CEA president and the Board and the new principal sought to restrict his union activities. Although Cowen makes general references to his role with the CEA, Cowan agrees that the new schedule did not violate the CBA as he still had a free period to conduct CEA business. Additionally, while he was asked to teach history courses that he had not taught in many years, he was certified to teach these courses. While it may have been burdensome and difficult for him to prepare for these courses, there is no evidence that it prevented him from exercising any of his rights protected by the First Amendment (union activities).

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (U.S. 1982) (citing *Procunier v. Navarette*, 434 U.S. 555 (1978) and *Wood v. Strickland*, 420 U.S. 308 (1975)). "The qualified immunity standard 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gilles v. Davis,* 427 F.3d 197, 203-04 (3d Cir. 2005) (citing *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). When applying qualified immunity, the court first asks whether "the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the [official's] conduct violated a constitutional right." *Curley v. Klem*, 298 F.3d 271, 277 (3d

---

[4] In addition to Repollet, Mr. Nicholas Sysock, the social studies department head, assisted in creating the schedule. Sysock avers that neither the Board nor superintendent had any input in the schedule decision. Therefore, this claim is dismissed against Ahearn and the Board.

Cir. 2002). The second question inquires whether it would be objectively reasonable for the official to have known his conduct was unlawful in the situation he confronted. *Saucier v. Katz,* 533 U.S. 194, 202 (2001).[5]

"The defense of qualified immunity is a recognition of the fact that subjecting public officials to personal liability for their discretionary actions results in the distraction of those officials from their public duties, inhibits their discretionary actions and, quite possibly, deters qualified people from accepting public service." *Ryan v. Burlington County*, *N.J.,* 889 F.2d 1286, 1292 (3d Cir. 1989). The Court must balance the "interest in allowing public officials to perform their discretionary functions without fear of suit against the public's interest in vindicating important federal rights." *Id.* (citing *Anderson,* 483 U.S. at 638 and *Hynson v. City of Chester*, 864 F.2d 1026 (3d Cir.1988)).

In *Harlow*, the Supreme Court held that "[r]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." 457 U.S. at 818. For a school administrator, there is nothing more "discretionary" than the responsibility to manage class schedules. The school principal has the authority to manage and revise schedules; this is an important role of the administration to efficiently manage the school. This is exactly the type of scenario in which qualified immunity should be applied. Altering a

---

[5] While the U.S. Supreme Court has held that the two-step process outlined in *Saucier* for qualified immunity analysis is flexible, it has held that "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan,* 129 S.Ct. 808, 821 (U.S. 2009).

schedule is clearly within the discretionary functions of the principal, and there is no evidence that a reasonable person in Repollet's position would believe that altering a teacher's schedule and subjects taught would violate a clearly established right held by the Plaintiff. Therefore, qualified immunity bars Plaintiff's claim.

Within the same claim, Cowan makes an ancillary argument that in addition to his schedule change, several teachers that were CEA members were transferred out of the school. He alleges this was done to constrict his ability to meet with CEA members during the day. There is no evidence of this allegation. The school transferred approximately thirty-six (36) staff members during this time period because of a budget crisis, and it clearly falls within the managerial tasks of the administration to meet its budget. Moreover, there is no protected speech by Cowan at issue in any alleged transfer of other teachers.

**B.     Count II:  Suspension for Unsupervised Class**

Count II is similar to Count I for purposes of qualified immunity. Here, Cowan asserts that on December 1, 2006, defendant Ahearn sent him a memorandum concluding that Cowan had abandoned his classroom on the morning of April 13, 2006 for a period of sixteen minutes during which time Cowan's students were left unsupervised. Cowan alleges this was retaliation for filing the instant lawsuit.[6] Cowan appealed the suspension to the Board; but he presented no evidence that the allegations were not true.

The Board conducted a hearing at which Cowan was present. The Board determined that

---

[6] Although there is some evidence that Repollet may have been acting against Cowan (See Siddons memo described on p. 3 of the Opinion), it does not overcome the qualified immunity defense. Therefore, this claim is alleged against Ahearn, and not for any conduct on the part of Repollet.

Cowan had left his class unsupervised, and as a result suspended him with pay for four days. No other evidence was presented at the time, by Cowan or Siddons, that demonstrates Cowan did not leave his class unsupervised. The Court finds that Ahearn's conduct at the time is protected under the doctrine of qualified immunity. One of the discretionary functions of a school administrator is to enforce school policies. In this case, there was a school policy that prohibited teachers from leaving a classroom unsupervised. At the present time, Cowan rests his allegations on the deposition of Siddons. As described above, Siddons testified that he recalls he sent someone to cover Cowan's class, but that he does not remember who he sent. For purposes of qualified immunity this has limited weight. When Ahearn and the Board evaluated the charge against Cowan they were not provided with this information from Siddons, and Cowan did not offer anything to the Board to justify his conduct. In evaluating qualified immunity, the court examines the reasonable conduct of the official at the time when the official acted and determines whether the official acted with reasonable knowledge that his conduct violated an established law. *See Harlow*, 457 U.S. at 818.

Ahearn and the Board were presented with credible evidence that Cowan left his class unsupervised from assistant superintendent Kathleen Skobo. Cowan did not present any evidence to dispute the charge. Disciplining teachers for leaving their students unsupervised clearly falls within the "discretionary functions" of a school administrator. On November 7, 2006, Ahearn was notified by Assistant Superintendent Skobo that the evidence of Cowan's abandonment had been discovered during the inquiry concerning Cowan's altercation with another teacher. Cowan presents no evidence that shows Ahearn or the Board knew Siddons allegedly provided a substitute teacher, and that suspending Cowan with pay for four days was a violation of Cowan's constitutional rights. Thus, qualified immunity is granted as to Count II.

C.     **Count III: "The Scab" Essay**

In the last count, Ahearn filed a disciplinary charge against Cowan because Cowan's distribution of "The Scab" essay was upsetting to two non-picketing teachers, and Cowan misrepresented the facts to the administration during the investigation. It was Ahearn who notified Cowan of his suspension.[7]

Qualified immunity is not appropriate here. There was an on-going labor dispute and Cowan alleges that Ahearn disciplined him because of his involvement with the union. In Count III, Cowan's suspension involved union activity, and it is reasonable to believe that Ahearn and the Board were aware that a suspension for union activity or for distribution of a political essay to fellow colleagues may implicate his First Amendment right of association.

"There is no question that public school teachers, like other public employees, 'may [not] constitutionally be compelled to relinquish the first amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public school in which they work.'" *Wichert v. Walter*, 606 F. Supp. 1516, (3d Cir. 1985) (citing *Pickering v. Bd. of Educ. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)). However, there are certain permissible restrictions placed on public employees. *Veggian v. Camden Bd. of Educ.*, 600 F. Supp. 2d 615, 620 (3d Cir. 2009) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006))

Generally, this right to engage in union activities pursuant to the First Amendment is clearly

---

[7] The only alleged conduct by Repollet was that he attended a meeting where Cowan was questioned about "The Scab" essay being distributed. Plaintiff has not alleged any facts that would show Repollet's conduct violated any of his rights. Thus, Repollet is dismissed from this claim.

established. *See Bradshaw v. Twp. of Middletown*, 296 F.Supp.2d 526, 550 (D.N.J. 2003). Similarly, there is a right to be free from retaliation for engaging in union activities. *Hitchens v. County of Montgomery*, 2002 WL 253939, at *8 (E.D. Pa. Feb. 20, 2002). *See also Schlichter v. Limerick Twp.,* 2006 WL 2381970, at *8 (E.D.Pa. Aug. 14, 2006); *Perna v. Twp. of Montclair*, 2006 WL 2806276 (D.N.J. Sep. 28, 2006). Efforts of public employees to associate together for the purpose of union activities "involve associated interests which the First Amendment protects from hostile state action." *Lablov v. Lolly,* 809 F.2d 220, 222-23 (3d Cir. 1987); *see also Lohman v. Borough*, 2007 WL 4260943 (M.D. Pa. Nov. 29, 2007). Hence, Cowan's union activities may be protected activities, *Labov*, 809 F.2d at 222-23; except to reach the final conclusion subjects the activities to a balancing test. *Pickering*, 391 U.S. at 570. Under *Pickering*, Cowan's union activities "will not be protected if the activities are outweighed by the government's interest in efficient operations." *See* Fed. Judiciary Ctr.*, Section 1983 Litigation* 72 (2d ed. 2008). In applying this test, the state actors subjective intent is not at issue. *See Connick v. Myers,* 461 U.S. 138, 166 (1983).

The test has been formalized as:

> 1. Where a public employee claims adverse action was taken in retaliation for constitutionally protected activity but the employer claims a legitimate reason for the adverse action, the employee's claim of retaliation is analyzed under a three-step process.
>
> A plaintiff must first demonstrate that the activity in question was protected. Second, the plaintiff must show the protected activity was a substantial or motivating factor in the alleged retaliatory action. . . . Finally, defendants may defeat plaintiff's claim by demonstrating that the same action would have been taken even in the absence of the protected conduct.

*Green v. Philadelphia Hous. Auth.*, 105 F. 3d 882, 885 (3d Cir. 1997); *accord Mize v. Borough of Kennett Square*, *et al.*, 1997 WL 152802 (E.D.Pa. Mar. 27, 1997).

16

The defendant contends that the disciplinary conduct was insufficient to deter a person of ordinary firmness from exercising its rights. *Veggian v. Camden Bd. of Education*, 600 F. Supp. 2d 615, 62 (3d Cir. 2009)  But the penalty had other repercussions.  For instance, on June 23, 2008, Cowan was notified of a "retroactive" suspension by Ahern and in the future discipline may include "withold[ing] your salary and adjustment increments in the . . . school year."  Knowing the salaries of teachers, making the threat to take away a raise would prevent a person of ordinary firmness from exercising his rights.

The Court must decide whether the distribution of "The Scab" essay constituted protected speech.[8]  This is an inquiry of law for the Court to determine.  The second inquiry is whether it was disruptive and whether Ahearn violated Cowan's First Amendment rights by suspending him. For the second inquiry, the jury must determine whether the disciplinary charge was in retaliation for the union work action or whether it was a legitimate charge based on the facts.

Cowan relies on *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264 (1974) for his argument that distribution of the essay constituted protected speech under the First Amendment. However, *Old Dominion* concerned a libel judgment based on a newsletter distributed by a union that listed the plaintiffs as "scabs" and also published Jack London's essay "The Scab."  The issue concerned federal labor laws preempting state labor laws.  The Court held that there was no libel because naming the plaintiffs as "scabs" was literally true under the definition of a scab–they were non-union employees.  The Court spends the majority of its decision discussing federal labor laws under the National Labor Relations Act and the union's interest in "trying to persuade other

---

[8] Plaintiff asserts that he was suspended for the dissemination of "The Scab" essay; as opposed to being targeted for organizing a "legal job action by working to rule."

employees to join the union without inhibition or restraint." *Id.* at 280.  The Court held that "[w]e believe that publication of Jack London's rhetoric is equally entitled to the protection of the federal labor laws." *Id.* at 283.  The Court further held that regardless of the law it applies, "we think that the same federal policies favoring uninhibited, robust, and wide-open debate in labor disputes are applicable here." *Id.* at 273.  Therefore, the distribution of the essay itself constitutes protected speech.

Nevertheless, there are disputed material facts as to whether Cowan's conduct was disruptive. Cowan placed the essay in mailboxes on school property during school hours.  The teachers were allegedly intimidated and the administration chose to deal with the issue.  Cowan allegedly lied about placing the essay in the mailboxes and the school dedicated time to an investigation of the security tapes in the mail room.[9]  Under the *Pickering* balancing factors, there are several non-exhaustive factors that a court should consider:  whether the public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded performance of public employee's duties; (5) interfered with operation of institution; (6) undermined mission of institution; (7) was communicated to public or to coworkers in private; (8) abused authority and public accountability that employee's role entailed; (9) abused authority and public accountability that employee's role entailed. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 209 (4th Cir. 2006); *accord Greer v. Amesqua*, 212 F.3d 358 (7th Cir. 2000).  Several of these factors raise important disputed facts concerning the reaction

---

[9] In his deposition, Cowan says that the principal asked him if he had placed any "letters" in these teachers' mailboxes and Cowan answered "No" because he argued that technically he did not place a letter, but an essay in the mailbox.  Cowan testified that had the principal asked him if he had placed an essay, he "probably" would have said yes.  Regardless, Cowan's answer was very evasive.

of the other teachers, any knowledge of the event by students, and whether the conduct proved to be disruptive to school activity. Thus, summary judgment is denied.

## IV.

For the foregoing reasons, Counts I and II are dismissed in their entirety. Count III is dismissed as to defendant Repollet only.

<em>s/Peter G. Sheridan</em><br>PETER G. SHERIDAN, U.S.D.J.

February 19, 2010